May it please the Court, my name is Kevin Garin, I'm with the law firm Shepard Mullen Richter and Hampton, and I'm here for the appellant Everett Laboratories in this case, and if I may, I'd like to reserve four minutes for questions. For rebuttal. That's granted. Thank you, Your Honor. And I guess I would, I'll try to stay as close to the mic. Thank you, that was much better getting closer to the mic, thank you. And that may cause certain people in the courtroom to think that I'm yelling at all of us here, but I'll do the best that I can. Well you can open the window in Philadelphia and I can hear it in Santa Barbara. I'd like to introduce at the council table my partner Don Pelto, Your Honor, as well as my colleague Julie Hopkins and my girl Rob Elliott who is a law clerk at our firm and is here to observe. Thank you. Your Honor, this is an appeal from a January 13, 2006, ruling denying a preliminary injunction in a trademark case by the District of New Jersey, the Honorable Dickinson Debevoise presiding. And I would note first, Your Honor, that the entire proceeding from which this arises basically took place in one day. It was decided on the papers and with the argument of counsel. And the judge took 45 minutes at the end and rendered his decision. His decision is found in the Joint Appendix at JA 3 through 18, actually. I think 18 and 19 are the only places where we actually see his decision. Your Honors, Everett Labs is a well established manufacturer of prescription nutritional supplements. They are prescription supplements because they contain folic acid. And doctors need to know that because folic acid can have interaction with other drugs and that's why they are prescription products. Counselor, Judge Debevoise decided this based upon the likelihood of confusion. He found there was no likelihood of confusion. How was his ruling in error? Your Honor, I think that there are four reasons why his ruling was in error. But the most important of those four is an error of law. Now, obviously, as the court is quite aware, the denial of a preliminary injunction is reviewed under abuse of discretion. And rulings of law are reviewed in a while. Rulings of fact are ruled under the clearly running standard of Rule 52A. We believe that the judge in this case made four fundamental errors of law. But the most important of those was in the application of the so-called lap factors from the injured case against lap, which over the years has been modified to some extent. The most recent iteration of those factors, I believe, is in the cost case, KOS. And I think that that case is very instructive as to why Judge Debevoise erred in this case. The district court considered the factor of the, in evaluating the likelihood of confusion, the judge considered only the possibility of mis-dispensing or mis-purchasing by the relevant purchasers of these two drugs. Now, the judge by that time had already decided that strovite, our client's drug, was a strong mark, and that there was a similarity of the two marks. And, in fact, had said in his decision that if this were a pure consumer case, that he might very well have found a likelihood of confusion. Our client submitted 10 affidavits from sales representatives, from pharmacists, someone from a doctor, showing that they initially, upon looking at these products, believed that they were made, that Korvai was made. Let me ask you a question, if I may. Yes, sir. And first, make sure that I'm getting picked up enough that Judge Aldisert can hear me. I accept. Okay. The cost case does talk about a countervailing public policy issue when speaking about prescriptive, prescription drugs. What I guess my question to you is, is there a way to view what Judge Debevoise did here as recognizing that there may be a countervailing policy and, nevertheless, saying, I just don't see sophisticated pharmacists under these circumstances, that is, this specific case's circumstances, falling into error when it comes to deciding how to deal with these. So that's a long way of asking. Does the sophistication of the pharmacist intermediary have any role to play here, or is it your contention that it has zero role, no role whatsoever? Oh, no, I think it does have a role. I mean, the factor being considered is the sophistication of the customer or the consumer of the product. Then why was he wrong? He was wrong because he considered only the possibility that there would be a misdispensing or a mispurchase of the product rather than a mistake by the purchaser of the source or origin of the product. And, in fact, the only evidence that was submitted was evidence by Everett showing that there was initial, at least, assumption that this product, Corbite, was made, in fact, by Everett, when it was made by Vertical. Mr. Gearing, this is Jeff Dolfus, sir. Can you hear me? I can, indeed, Your Honor. All right. This was a proceeding for a preliminary injunction, is that right? That's right. Was there a hearing where witnesses were sworn, examined, and cross-examined? No, it was not, Your Honor. How can you say this was evidence presented? You only present evidence at a hearing. I don't understand that in a pre-act proceeding. As complicated as this, there wasn't a hearing with witnesses put under oath, sworn, cross-examined, and having the judge make findings of fact and conclusions of law. Isn't that the normal proceeding in a preliminary injunction matter? I don't believe that it is always the case. In fact, Judge Debevoise considered numerous affidavits, sworn affidavits, submitted by both sides, where an argument of counsel did purport, in fact, in his own words on JA 18 of the appendix, to enter conclusions of law and findings of fact. Our contention to respond to Judge Jordan's question is that Judge Debevoise clearly did not mention in his decision that he was considering anything other than the possibility of misdispensing or the danger of mispurchasing by doctors or pharmacists. We think that the cost case makes it very clear in proceeding cases like the Victoria's Secret case, etc., that in this circuit, the likelihood or the possibility of a mistake as to the source or origin of the product is an independent reason to find in favor of the movement on that particular issue. Well, Judge Debevoise does say, and I'm looking at JA 18, the plaintiff in this case, Everett, has submitted evidence of five pharmacists who early on when they first heard the name associated it with strovite, the Everett product. So there he's looking to source. And then we're surprised, they said, to learn that Corvite was sold by Vertical and not by Everett. This was an initial confusion and can be weighed in the balance. So it looks like what Judge Debevoise is doing, and obviously we have a short opinion here, he is noting the initial confusion, but then he goes on to analyze intent, he goes on to analyze packaging, he goes on to analyze other things and concludes that if this were a consumer product, the name similarity alone might lead to confusion regardless of the different packaging. However, in the circumstances of this case, particularly the difference in the packaging and the method of marketing, to have a sophisticated purchaser, it seems there is very little likelihood of confusion. And he does recognize source. So I don't know how you could say that he didn't consider that aspect that you think is so important. Well, Your Honor, he did in context of the likelihood of actual confusion. He mentioned what happened, what was mentioned in the affidavits. But in considering this all-important factor of the sophistication of the consumer, he merely considered, I think this is very clear from his decision, the possibility of misdispensing or mispurchase, which is exactly what Judge Jordan was referring to as the special standard that applies to pharmaceuticals and the danger of that sort of thing. But if a purchaser initially assumes, and I would focus on initial interest confusion as well because Judge Debevoise had decided in an earlier case involving initial interest confusion, I think that that is enough, too, that if the consumer initially assumed that the product was actually manufactured by Everett instead of by its three disloyal employees who concocted this new company and came up with this similar mark in exactly the same channel of trade, that that would be a factor that would favor Everett and not favor Vertical. I see that I'm out of time here, Your Honor. We'll hear from you on rebuttal. Thank you. May it please the Court. I am Charles Kennedy. I represent the Apple League Vertical Pharmaceuticals in this matter. Pull the microphone even closer, please. Is that better, Your Honor? And I will try to speak up. Thank you. Can everyone hear me? Okay. I represent the Apple League Vertical Pharmaceuticals in this matter. The district judge below did not engage in errors of law. He did not engage in clearly erroneous fabrications. And I believe his decision can be sustained quite easily. Yes, Your Honor. Let me start by giving you this quote from Cost. Counsel, this is Judge Alba. You used the expression that he engaged. The argument was that the judge did not participate in proper fact-finding. There wasn't a hearing here, was there? There was no. This was not a hearing, as I asked my friends. Our witnesses were sworn. And how can a judge find facts if there's no hearing? I'd like you to address that. I'll defer to his question first. Thank you, Your Honor. The plaintiff in this case did not ask for a fact-finding, Your Honor. So there was no fact-finding done by the court. It was done solely on the affidavits in this case. As to the question by... I haven't quite got it out. I've given you that quote from Cost, which says it's clear error to treat misdispensing as the only relevant landmark. You've heard your opposing counsel say that is, in effect, what the court here did. And, indeed, there is language that they can point to with some credibility that shows that he thought the court here thought the care and attention... Please get closer to the microphone, sir. The care and attention which consumers pay in purchasing this product is what I consider to be a critically important factor in this case. Mr. Kennedy, that's what the court has said there. So why isn't this clear error, as your opponent says? Because Judge Debevoise did not consider and did not limit his analysis to misdispensing. That is not correct. And let me go through exactly what was done in this case on the likelihood of confusion analysis. The argument was that there would have been likelihood or possible confusion in a couple of ways. One is misdispensing, and I don't think there's any question that Judge Debevoise disposed of that. The second argument that was made was that pharmacists in purchasing the products... Not misdispensing. Pharmacists purchased the products in order to stop the pharmacies in expecting orders to come in or prescriptions to come in from the doctors. And Everett argued that the pharmacists would have a misconception as to whose product they were purchasing or whether there was an association between the two products. That was argued to Judge Debevoise, and Judge Debevoise, in fact, considered that explicitly in his opinion. If you go to the appendix 18, and it's on the transcript at page 55, he addressed that very clearly. He says down here at line 21, Is that different from looking at misdispensing? The pharmacists were never going to mix up on their shelves which product is the Everett product and which is the product of their competitor. Is he talking there about concern that the mix-up would result in misdispensing, or do you think it's something different? I think it's something different. I think it's two elements that he's talking about, and both of them were argued to the judge during the preliminary injunction hearing. One is whether, when they have the containers in their pharmacy and they get a prescription in, whether they're going to mix them up. But the other potential confusion that was argued by Everett and the judge found not to be likely was that pharmacists, when they're purchasing these products, before a prescription has come in and they're being confronted with a new product when they purchase it, that's where the judge is saying, well, they would have the package when they're purchasing. They would see what the package was like, and they would not be confused between the two products because the package would also remove any possibility of confusion. It's not in a prescription circumstance, Your Honor. It's in a circumstance where you have the pharmacist purchasing. And that was what was argued by Everett. In addition, I think as was pointed out already, if you go into the analysis on initial confusion, what they contend is initial confusion, the court clearly considered that and found that it did not show a likelihood of confusion. Now, that evidence, I might mention, is extremely weak evidence because here's what it showed. There were affidavits by pharmacists, and all the court found is it shows that when they first heard the name Corvite, before the product was even out there, that they thought there might be an association with strovite because, of course, strovite was already out there. That initial, what he called initial confusion, dissipated immediately. Counsel, this is Judge Olson again. I'm not sure that I am catching all of your arguments, but I want to jump in. Yes, Your Honor. In considering the last act, okay, would you concede that the way the trial judge analyzed those, he decided a larger number in favor of Everett rather than you people, that as I read your brief, the length of time the defendant has used the mark without confusion, that that was a matter that was contested, so you needed fact-finding there. And secondly, on the evidence of actual confusion, that they seemed to be, that seemed to be contested too, that there was evidence of initial confusion that unlikely thereafter that anyone would misuse or mispractice. Now, on this whole question of confusion, don't you think that that needs some fact-finding on the basis of your, of the testimony or the representations? Your Honor, I believe, first of all, that in terms of the number of factors that may have gone one way or the other, that's not important. As this Court has said in other contexts, the question is... I'm not sure that I will agree that all the lat factors are not important. Go ahead. Your Honor, my point was not that all the lat factors are not important. This Court, the District Court, has clearly considered evidence on each of the lat factors. I believe, though, it's not the law that you total up the lat factors and then decide who wins on a numerical basis. We know that. We know that. In terms of the evidence on actual confusion or the initial confusion evidence that they submitted, they did not bring witnesses in. Those were solely on affidavits. And I might mention that the type of evidence that was submitted is this. It was not spontaneous confusion, which is what you had in the Cost case, 60 instances of spontaneous confusion, 6 misprescriptions in the Cost case. Here, this was simply a situation where an employee went out and interviewed selected pharmacists. So it wasn't spontaneous. And they submitted word-for-word identical declarations by these pharmacists contending that there was an association. I was pointing out they're very limited to just something that occurred when the name was out there but before the product package was actually out there. What kind of weight do we need to give counsel to the emphasis in the Cost case that is laid on the policy concern associated with misdispensing? I mean, there's pretty strong language in that case, wouldn't you agree, about how important it is when dealing with prescription drugs or supplements that prevention of confusion and mistakes is just too important to be trifled with, I think, is the language that they use. So if we agree with you that you don't just tote up the number but you look at relative weight, what kind of weight do we give to that factor? Your Honor, if you're talking about misdispensing of medications, I would agree that you should have very strong evidence that that does not occur because of the public policy that you mentioned. But in this case, there's absolutely no question that misdispensing was not considered likely. In fact, it wasn't even contended that misdispensing had ever occurred or would occur in this case. You're saying that your opponent, when he gets up here, isn't going to disagree with you and say, oh, we did indeed raise the issue of misdispensing? They submitted no evidence that misdispensing would ever be likely under these circumstances, Your Honor. And I think maybe the best way to go at it is to look at the Cost case, which is where that public policy comes about because it was quite a different concern in the Cost case. In the Cost case, what the District Court did is because the medications involved, and they were very close marks, incidentally. They were Advocor versus Altocor, marks that were fairly close and quite similar. And what happened was the Court … Unlike the vastly different Corvite and Strolay. That's correct, Your Honor, because one difference between the similarity of the marks there is in the Cost case, the Court, and this is at page 713 of the opinion, made it clear that no descriptiveness of the product explains the similarity between those two marks. In our case, Strovite and Corvite, you have the similarity of the VITE suffix. And we had submitted evidence that there were 25 other vitamin products out there with a VITE suffix. That was undisputed evidence. And three of those were prescription vitamins. Judge DeBois didn't pick up on that, on the VITE aspect that you were pursuing. He didn't agree with me either. I mean, he said there was, looking at the names, a similarity, right? Well, here's how Judge DeBois broke it down, Your Honor. But first the point, Judge DeBois did not pick up that VITE was descriptive and widely used, and that actually is an error of law under the A&H Court Square case for his finding that there was strength to the mark. But when Judge DeBois looked at the two marks, what he said was this. He said, let's take Stro and Cor. There is a superficial similarity between those two. Then when he took VITE, he recognized that the mark VITE, that the portion VITE, related to vitamins. He even said the parties didn't conceive that. But he didn't take into account that if the similarity between the two marks relates to that descriptive portion, that it's not actionable in a likelihood of confusion analysis. And we've cited cases from pages, I believe it's 23 to 25 of our brief, that show exactly that result. Your Honor, getting back to the difference, though, in the Cos case, because I do think they're worlds apart. And this, what Judge DeBois did in this case is wholly consistent with what happened in Cos. In the Cos case, the marks were quite similar, as I mentioned, and there was no descriptive explanation for that being similar. There were 60 instances of actual confusion. And six of those instances were where there were misprescriptions of the very medications involved. So you have a decision by a district court that there's not likely to be misprescriptions. In the face of that, you have six instances submitted by the trademark owner that misdescriptions had occurred. The strength of the mark, the plaintiff's mark, is also greatly different. $70 million in sales, $40 million in advertising in the Cos case. In our case, and I think this is also another significant difference, the Strobite mark has sales that are dwindled now to about $60,000 a year. What they submitted, Your Honor, is evidence of sales, total sales, of other products. The Strobite Forte, Strobite Advance. Excuse me a moment. Does the existence of those other products using the Strobite mark have any bearing on the strength of the mark? I guess I should ask it this way. Are you contending that they may have other products that use the Strobite name? Is it relevant? I think it's relevant to this, Your Honor. The sales of the product, the judge took their mark to be Strobite. If he takes their mark to be Strobite alone, then you look for the commercial strength of the mark only to the sales of Strobite, not to the sales of, for instance, Strobite Forte. That's the question I'm asking. So your position as a legal matter is that if they have a variety of products leveraging the Strobite mark, that you don't look at any of those other products. You only look at whatever they've marketed under Strobite alone. That's the legal position you're taking. My legal position is, my position is, Your Honor, if you're going to look to those others, if you say, okay, then let's look at the commercial success of every product that uses the word Strobite, then when the court comes to the comparison between the marks, it's a different comparison. In other words, if Strobite Forte is a product selling a million a year and Strobite is selling 60,000 a year, when you do, it's fine to say strength of the mark. I'm going to look at the sales of Strobite Forte. But then when you get to the argument about similarity of the marks, you've got to compare Strobite Forte with Corbite. And I would suggest that that's a comparison that easily goes in favor of the defendant in this case. Those two factors have to work together. What happened by the district court, and why I think it was an error, is that the VITE portion was read out of both, both the factors. You get it read out of the strength of the mark, and then when it gets to the similarity, the court doesn't consider that the fact that the only direct similarity is in the VITE term was significant. Okay, Your Honor, I see that my time is up. Thank you. Thank you. All right, we'll hear on rebuttal. Counselor, could I ask a question about what we did decide in costs? Did we not decide that likelihood of confusion is not limited to confusion of products, as in misdispensing, that it's also actionable and broad enough to cover the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers, nor simply as to source of origin? That was part of what I was actually going to quote from costs, Your Honor. I think that favors Everett in this case, my client, because the whole problem in costs was that they only considered the possibility of misdispensing. But you can see that both are relevant. They are all relevant, Your Honor. And, in fact, I've got page 12 here. That is a Westlaw page number. But this court in costs emphasized that the Lanham Act has been broadened under 43A to cover confusion as to source, which is also actionable, in addition to the danger of misdispensing. And didn't Judge Debevoise, well, I'm not going to argue with you. I believe that that was on the confusion point, and, Your Honor, I think that that initial confusion of the pharmacist or of the sales representatives and that sort of thing is itself the kind of confusion that is actionable under the Lanham Act because, at least for a temporary period of time, it impairs the goodwill of Everett because it confuses the two entities. Even if it's only initial interest confusion, that's been recognized, of course, as being actionable as well. Let me interrupt you because, on this point, your opposing counsel has pushed pretty hard on what I think, in effect, is a failure of proof argument, that you just didn't come forward with evidence sufficient to meet your burden of proof at the preliminary injunction stage because the only thing you had was boilerplate, five boilerplate affidavits, which he says is vastly different from the actual confusion kinds of proof that were given in the cost case. What's your response to that? Well, my response to that is that I think, actually, Judge Debevoise viewed that as either neutral or in favor of Everett. I think there were actually 10 affidavits. And the statement by Mr. Kennedy that there was no allegation of misdispensing is belied by the Kagan Declaration at JA 286, where a registered pharmacist was asked to fill a prescription for Corbite, and he assumed that the prescription was for strobite. So there was actually, I mean, he didn't actually dispense it, but his initial reaction to it, a registered pharmacist, was that he thought that Corbite was strobite, thereby identifying and associating it with my client's product. Could you acknowledge that the district court could discount untested declarations where there's no indication of the potential for bias or anything else is just a flat declaration? Could the district court not discount that as proof? But I don't think the district court did. The district court didn't mention that at all. And, in fact, I don't think that it was the burden of the movement in this part, in this particular case, to ask for discovery when the only affidavits that were submitted on these points, the only affidavits were submitted by the moving party. There were no opposing affidavits. Had there been, then perhaps it would have been my client who would have asked for discovery, but we saw no need to because there were no opposing affidavits. The only opposing affidavits were from the three disloyal employees, or two of them, I guess, who founded the company and then the attorney who says that he did a trademark search and didn't think that Corbite was confusing with strobite. What would be an appreciable number? Under our case law, the finding requires that an appreciable number, appreciable number of ordinarily prudent consumers of this type are confused. In this marketplace, what would be an appreciable number to your mind? Well, Your Honor, I don't think there's an exact number. In survey cases, folks have, the judges have talked about 40 percent, 20 percent. Some judges have looked at smaller or larger numbers. But we had, again, ten unopposed affidavits in this case. I also would like to just mention. Hold on a second. You say you had ten unopposed affidavits. You were able to identify one affidavit in which you said there was something said about a risk of misdispensing. Is there anything else? Well, the other affidavits talked about an initial confusion as to source, which, again, impairs the goodwill. I'm out of time. I wanted to just add, if I might, just one very minor point. Add one very minor point very quickly. And that is that in the lab case itself, this court said that where the products are identical and are going to the same channel of trade and everything else, it's the name that matters. It's the two names. And here, I think that was a finding of fact that was not clearly erroneous, that this was an arbitrary mark that was very similar to the other mark. And those are findings of fact that were not clearly erroneous. And although the appellee raised that in its brief, he didn't mention it at all in the showing of the facts. All right, that's fine. Judge Jordan has a question, and then we'll see whether Judge Aldisert has anything further. Yeah. I need to know, on this question of fact versus law, if you would respond briefly, please, to the assertion by your opponent that Can you speak up a little more, please? Yes. Can I hear? Yes, I can. You had, I think, heard Mr. Kennedy's argument that you unfairly stacked the deck by including in your commercial success evidence a variety of products using the strovite name but other parts to a name, and then asked the court to just compare strovite and corvite. In other words, you got an apples to oranges comparison there, and as a legal matter, that's error. What's your response? I don't think the case law supports that. It's a strovite family of medications, nutritional supplements, that have slightly different components in them. But they all have strovite, and they're all identified with Everett Labs. I mean, Coca-Cola Light, Coca-Cola Diet Coke, et cetera, are all associated with the Coca-Cola company. And the fact that they add another word like that certainly doesn't dilute. This is a family of nutritional supplements, all of which compete with corvite directly. Judge Augustert, do you have anything? Yes, I would like to ask, would you agree that both you and the judge emphasized the question of confusion more than any other issue? Is that a fair statement? Well, Judge Augustert, the standard is likelihood of confusion based upon the 10-lap factor. So it's clear that we did emphasize confusion, and that's exactly where we think the district court erred, because it looked only at misdispensing under the third factor and said that that was more important than everything else, just as the court had done in costs. And this court re-ended with directions to enter a preliminary injunction, because it emphasized – You know what, I just wanted to answer this question, because I have another question. If I understand the ruling of the court, it was in one sentence where the court said, in the circumstances of this case, particularly the difference in the packaging and the method of marketing to have a sophisticated procedure, it seems to me that there is very little likelihood of confusion, despite the similarities of the names. Would you say that that's a fair summary of the court's reasoning in this case? Well, I think that's the ultimate conclusion of the court, which considered only the one factor, which was likelihood of success on merits. And we think that that was infected by an error of law in not considering under the sophistication prong, number three. The final question that I have for you, your friend said that you made the decision that you did not want a hearing in this case where witnesses would be called and facts found and conclusions of law. Was he correct? Was that your position? Your Honor, I don't believe there's anything in the record that shows that there was a refusal on the part of the plaintiff not to do that. What I wanted to emphasize was that there were no oppositions to the factual affidavits that were submitted, and therefore there would be not necessarily any reason to make a discovery. I'm sorry. I guess you didn't understand my question. Did you request the district court not to have a hearing, but to decide this on arguments and affidavits? I believe neither side requested that, Your Honor. But you did not say, Your Honor, I have witnesses here. Is that correct? That is correct, but we had unopposed affidavits. And you are not contending on appeal that the court should have held an evidentiary hearing, are you? I'm noting that the court decided as it did, solely on the papers, and neither side requested anything more than that. All right, neither side requested. That I can see. All right. Judge Officer, does that answer your question? All right, that's the next question. Counsel, what do you want this court to do? Well, the relief that we're requesting is because we believe that… Tell me the relief that you're requesting. Okay, there were seven factors that Judge Deverois… Relief, relief, not factors, relief. What do you want us to do, reverse and remand? Remand with directions to enter an injunction. To enter the injunction, not let the court reconsider it, but enter the injunction. If there are directions to enter an injunction, then to renounce the factors and reconsider. Thank you. Thank you. Thank you, Counsel. The case is well argued. We'll take it under advisement. We'll call our next case, which is Rikiki v. Attorney General.